OPINION
Helen Washington appeals her conviction of theft in office in violation of R.C. 2913.04. Finding no error, we uphold her conviction.
 I.
Helen's conviction is based upon her use of Pay-Ease cards that were issued to Angela Kreitzer, Allen Elliot, Kent Buchanan, and Celisa Jackson to access the Pay-Ease computer system. Pay-Ease cards, which resemble ATM or check cards, are issued by the government in place of food stamps. Each month the recipient must place the Pay-Ease card into the Pay-Ease computer system, which resembles an ATM machine, to activate the card or, in other words, to download the recipient's benefits onto his or her Pay-Ease card. Each recipient is given a PIN number to download the monthly benefits onto his or her card. The recipient can activate the card at either of two grocery stores, which the recipient selects from a list of over one hundred grocery stores in the county, or at the Pay-Ease office.
Once the card has been activated, the recipient can use the card at any approved grocery store. The recipient also uses the PIN number to access the benefits on his or her card. The recipient accesses the benefits by using the card and PIN number as one would use an ATM or credit card in the grocery store check out line.
James Codispoti, a welfare theft investigator, started an investigation of Helen in November of 1994, after he received a tip concerning Helen's attempt to remove a block that had placed on Allen Elliot's card. Helen went to the Pay-Ease office on November 18, 1994, seeking to remove a block on Allen Elliot's card. Helen spoke with Reggie Orr, an employee in the Pay-Ease office. Orr was unaware of whose card Helen was attempting to activate.
While Orr was helping Helen remove the block from the card, Allen Elliot, the person to whom the card was issued, had entered the Pay-Ease office to try to obtain a replacement card because he had recently reported his card stolen. Allen Elliot was assisted by Janice Muncie. Muncie called to check on the status of Elliot's lost card and discovered that it had just been unblocked by Orr. So, Muncie went to speak with Orr. Orr explained to Muncie that Helen had the card and that she had requested that the card be unblocked. Muncie informed Orr that the person to whom the card was issued, Allen Elliot, was in the office and that he had reported the card stolen. Upon learning this, Orr decided to replace the block on the card and inform Helen that he was unable to remove the block.
Muncie then told Elliot that Helen had his card, and afterward Helen and Elliot left the office together. As they were leaving, Orr overheard Helen asking Elliot if she could talk to him in the hallway for a minute. He also overheard Helen ask Elliot if he remembered giving his card to her husband. A few days later, Helen returned to the Pay-Ease office to again attempt to use Elliot's card. When she was unable to get the card to operate, she again sought Orr's assistance. Orr informed Helen that he was unable to remove the block.
Muncie immediately reported the incident to her supervisor, who reported it to Codispoti, a welfare fraud investigator. Following up the lead, Codispoti spoke to Reggie Orr and Janice Muncie. Codispoti asked Orr and Muncie to watch for Helen using either of two Pay-Ease machines located in the Pay-Ease office and requested that they obtain a copy of the transaction receipt from the computer whenever they saw her using either of the machines. Codispoti further requested that they call him whenever they saw her using either of the machines. The Pay-Ease machines in question are used solely for activating Pay-Ease cards and for performing balance inquiries; no money can be withdrawn from those machines.
On December 6, 1994, Muncie called Codispoti and told him that she had seen Helen use the Pay-Ease machine and that she made copies of Helen's transaction receipts. Muncie turned over two receipts to Codispoti; one receipt was from a transaction that Helen had made with a card issued to Angela Kreitzer and the other was from a transaction that Helen made with a card issued to Celisa Jackson. On several other dates over the following months, Muncie noticed Helen using the Pay-Ease computer system. Muncie also provided Codispoti with copies of those transaction receipts. Codispoti determined that, during those months, Helen had activated the cards of Angela Kreitzer, Kent Buckhanon, and Celisa Jackson.
Codispoti began investigating Angela Kreitzer. In March of 1995, Codispoti determined that Kreitzer was living in Middletown, Ohio, in an apartment owned by the Washingtons'. Kreitzer, in applying for her Pay-Ease card, had stated, however, that she lived at 2311 Della Drive in Dayton, Ohio. That address was for another unit owned by Helen and Jim Washington. According to Codispoti, when he confronted Kreitzer about Helen's use of her Pay-Ease card, Kreitzer informed him that she never lived at the Della address and that the Jim Washington had suggested that she apply for Montgomery County welfare benefits using that address.
Codispoti also claimed that Kreitzer told him that she sold her Pay-Ease card to Jim Washington for a hundred dollars, which he paid her every month; the monthly benefits on the card were only one hundred and twelve dollars. At this point it must be noted that it is illegal for recipients to sell their cards for cash and that the card's benefits are to be solely used for the purchase of food.
According to Codispoti, Kreitzer further explained to him that she was not in possession of her Pay-Ease card and that either Helen or Jim had her card as well as PIN number. In fact, Kreitzer admitted that she had not seen her card since November of 1994. Kreitzer's benefits were activated in November and each month thereafter. Furthermore, the entire amount or nearly the entire amount of the card's benefits was used for each of those months.
In contrast to Codispoti's testimony, Kreitzer testified that she had moved from the Della address to another apartment owned by the Washingtons in Middletown, but had never changed her address. Kreitzer explained that she had lied when she told Codispoti that she had never lived in the Washingtons' apartment on Della Avenue in Dayton because she had outstanding traffic tickets in Dayton. Nonetheless, Kreitzer admitted that she continued to receive rent subsidies and Pay-Ease benefits from Montgomery County even though she no longer lived in the county, and that during that period her rent subsidy check was paid directly over to one of the Washingtons' real estate holding companies.
Kreitzer also admitted that the Washingtons' had her Pay-Ease card, but Kreitzer maintained that they had her card in order to purchase groceries for her because she did not have any transportation to get to the grocery store. Kreitzer had not designated either of the Washingtons as her personal representative, however, which was necessary for Helen to be able to use the card because recipients are told that only the recipient and the recipient's official Personal Representative are permitted to use the Pay-Ease card and computer system. Furthermore, Helen testified that she had never purchased groceries for Kreitzer and that she was the one in her family that did the grocery shopping.
Jim Washington also testified that he never purchased groceries for Kreitzer. Jim explained that, instead, Kreitzer had asked him to have Helen activate her card for her because Helen worked in the same building as the Pay-Ease office. Jim claimed that Kreitzer did not have transportation to get to a Pay-Ease machine to activate her card, and that he gave Helen Kreitzer's card for her to activate it as a favor for Kreitzer. Testimony was also presented as to how Helen came into possession of Allen Elliot's card. Although the parties were unable to locate Allen Elliot to testify, the prosecution was permitted to present the testimony of other witnesses as to how Helen came into possession of Allen Elliot's card. First, the State presented the testimony of Codispoti, who at one time questioned Elliot about Helen's attempt to activate his card. According to Codispoti, Elliot told him that Jim Washington buys food stamps and Pay-Ease cards. Elliot told Codispoti that he needed some money and that his friend Vickie Moore told him that Jim Washington, her landlord, purchases food stamps and Pay-Ease cards. Vickie purportedly called Jim for Elliot and then the two drove to Jim and Helen Washingtons' home. Codispoti testified that Elliot told him that when they arrived at the Washingtons' home, he gave Moore the card and his PIN number and waited in the car as she went into the Washingtons' home. Moore then returned with one hundred dollars.
The State also called Vickie Moore, who as we previously mentioned was a tenant of one of the Washington's rental properties and we now also add was an employee of the Washingtons. Moore testified that in November of 1994, Allen Elliot wanted to sell his Pay-Ease card to raise money for prostitutes and drugs. Moore called Jim Washington about him purchasing the card and, afterward, Moore and Elliot drove to Jim and Helen Washingtons' home. According to Moore, Elliot sold his Pay-Ease card and PIN number to Jim Washington for one hundred dollars; the card's individual monthly benefits were not much more than that amount. Moore also testified that Helen was not present when she sold Elliot's card to Jim. Additionally, Moore testified that Elliot did, in fact, use the money to purchase drugs and prostitutes.
Conversely, Helen and Jim Washington testified Vickie Moore and Elliot gave the card to Jim for safekeeping. At that time, Jim Washington was Moore's designated payee for her SSI benefits. According to Jim Washington, Moore told him that Elliot and she were living together and sharing expenses. Furthermore, Jim claimed that Moore stated that they were going to share Elliot's Pay-Ease card benefits and her SSI benefits. Jim testified that Moore said that because they were going to share his Pay-Ease benefits, she did not need the money that he had set aside for her in SSI benefits for groceries, and asked if he could give her a hundred dollars of the money that was set aside for her grocery benefits. Jim usually only gave Moore her SSI benefits in five dollar increments because he claimed, otherwise, she was apt to waste her monthly benefits on drugs.
Jim stated that he explained to Moore that one hundred dollars was all the money that she had for the month and that, if she spent it, she would not have any other money for the month. According to Jim, Moore stated that her groceries were taken care of by Elliot and her sharing Elliot's Pay-Ease card benefits. She then asked Jim if he would hold Elliot's Pay-Ease card until she picked it up later. Jim stated that Moore told him that she had lived with Elliot before and was worried that Elliot would take the Pay-Ease card and use all of its benefits himself even though they were supposed to be sharing expenses. Jim stated that he agreed to Moore's proposal and gave Moore a hundred dollars of her SSI benefits and took Elliot's card for safekeeping. Jim claimed that this was the reason why he had Elliot's card and why he gave Moore the hundred dollars.
Jim further testified that he had given Helen the card because Moore returned a few days later to retrieve the card, and attempted to use the card to buy groceries, but found that it would not work. Moore then brought the card back to Jim and explained that she was not able to use it and asked Jim to give the card to Helen to see if she could find out what was wrong with the card. As we previously stated, Helen worked in the same building as the Pay-Ease office and it was easy for her to validate cards for individuals or check their balances on the way to or from work.
Jim testified that he at one time was the Personal Representative of his mother with regard to her Pay-Ease benefits and, when the card needed to be activated, it was convenient for him to give it to Helen for her to activate on the way to work. Therefore, when Moore came to him with her problem, he gave the card to Helen for her to take it into the Pay-Ease office to figure out what was wrong with it. Helen did so, but was unable to get the card to work.
Helen testified that she believed that it was Moore's card and that she did not initially know that it was actually Elliot's card. She further testified that after she discovered it was Elliot's card, she believed that Elliot was attempting to keep Moore from the card's benefits even though they had a sharing arrangement. Helen stated that she was just trying to help Moore out by trying to get the card to work.
Jim testified that Helen came into possession of Kent Buckhanon's card because Buckhanon, one of the Washingtons' tenants and employees, approached Jim on a couple of occasions and asked Jim to drop him off downtown so that he could go into the Pay-Ease office and activate his card. Jim testified that, on one of those occasions, Buckhanon went to Helen's office, which is located in the same building as the Pay-Ease office, and asked her for bus fare to get back home. Jim further testified that when Buckhanon approached him again for a ride downtown, he told him "Well, just give me the card, and I'll give it to Helen, and she can verify it for you." Jim stated that he did just that, and after Helen activated the card, Jim returned the card to Buckhanon.
Finally, there was testimony as to how Helen came to have Celisa Jackson's Pay-Ease card. Celisa Jackson testified that Helen's daughter-in-law asked her for some money for food, so Celisa loaned her Pay-Ease card to Helen's daughter-in-law and permitted her to use twenty dollars from the card. Helen testified that her daughter-in-law gave her the card and asked her to check the balance. Helen also testified that she thought that it was her daughter-in-law's card.
Based upon Codispoti's investigation of Helen, she was indicted by the Montgomery County Grand Jury on May 16, 1997 on nine counts: six counts of unauthorized use of property in violation of R.C. 2921.41(A)(2); one count of theft in office in violation of R.C. 2913.04(B); and two counts of attempted or unauthorized use of property in violation of R.C. 2913.04(B). The State's case was based upon Helen's activation of the Pay-Ease card benefits and her performing balance inquires on the cards. The State did not present any evidence demonstrating that Helen used the benefits on the Pay-Ease cards that she activated, although the State did claim that she was the one that used the benefits. Rather than prosecuting her for the theft of the benefits, the State's case was based upon her unauthorized use of property — the Pay-Ease computer system. The offense of unauthorized use of property does not require a theft in the traditional sense; instead, it is based upon the use of property without the permission of the owner.
Following a jury trial, Helen was acquitted on the six counts of unauthorized use of property and the two counts of attempted unauthorized use of property. Helen was convicted of the theft in office count, however. The court sentenced Helen to one year imprisonment and fined her $5,000.00. Nonetheless, the court suspended her imprisonment.
 II.
In her first assignment of error, Helen argues that:
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING MRS. WASHINGTON'S MOTION FOR DIRECTED VERDICT AT THE END OF THE PROSECUTION'S CASE IN CHIEF.
Under this assignment of error, Helen argues that the prosecution failed to present sufficient evidence for a reasonable trier of fact to find that her actions were without the express or implied consent of the owner of the computer, computer system, or computer network. Helen was charged with unauthorized use of property under R.C. 2913.04(B), which provides that no person
 shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, or computer network without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, or computer network or other person authorized to give consent by the owner.
R.C. 2913.04(B). R.C. 2913.01(D) defines the term "owner" as "any person, other than the actor, who is the owner of, or who has possession or control of, or any license or interest in property or services, even though the ownership, possession, control, license, or interest is unlawful." R.C. 2913.01(D).
Helen argues that Pay-Ease cardholders qualify as "owners" under this definition. Helen supports her argument that the Pay-Ease cardholders qualify as "owners" of the computer system in question by asserting that the Pay-Ease cards themselves are a kind of "computer, computer system, or computer network" because they have a computer chip embedded in them. Helen further argues that the Pay-Ease cardholders are "owners" of this "computer, computer system, or computer network" under R.C. 2913.01's definition of an "owner" because the Pay-Ease cardholders have possession of the computer chip embedded Pay-Ease cards, and one's possession of the property is sufficient to satisfy that definition of an "owner." Moreover, assuming that the Pay-Ease cardholders qualify as "owners" and that the cards constitute the computer that was accessed, Helen argues that the State failed to prove that she accessed the cards without the consent of the cards' "owners."
Even if this court would find that the Pay-Ease cardholders can qualify as "owners" of the computer chip embedded cards, the State presented more than sufficient evidence that Helen used the card to access the Pay-Ease computer system, which Helen cannot claim was owned by the Pay-Ease cardholders. It is clear from the evidence presented at trial that the Pay-Ease computer system is owned by the State, Federal, and County governments as well as National City Processing Company. Thus, the State's purported failure to prove the cardholders' lack of permission to use the Pay-Ease cards has no bearing on whether she had the consent of the owners of the Pay-Ease computer system to access that system. Consequently, we find that this argument lacks merit.
Helen also argues that even if cardholders do not qualify as "owners," the Montgomery County Department of Human Services qualifies as an "owner." Furthermore, she asserts that the Montgomery County Department of Human Services impliedly consented to her use of the Pay-Ease computer system. In particular, she claims that it impliedly consented to her use of the Pay-Ease system through its employees, Janice Muncie and Reggie Orr. Muncie and Orr knew that Helen was accessing the system, at times even assisted her in accessing the system, and did not attempt to stop her or report her for several months. Helen claims that, as employees of the Department, Orr's and Muncie's inaction constituted implied consent to her use on the part of the Department.
We are also unpersuaded by this argument. Helen's mother-in-law received Pay-Ease benefits, and Helen was at one time her authorized Personal Representative. Orr and Muncie testified that they assumed that Helen was activating the benefits on her mother-in-law's card. In fact, Muncie testified that before she discovered that she was attempting to activate Mr. Elliot's card, she "really didn't think anything about it because [she] * * * knew at one time her mother-in-law was receiving food stamps on a Pay-Ease card." Tr. at 311. Muncie further testified that she "thought she was coming into * * * [their] office to activate her mother-in-law's card." Id. Although no one objected to her activating the card that they thought was her mother-in-law's, as soon as Muncie discovered that Helen was attempting to activate someone else's card, she called her supervisor and reported the incident.
Furthermore, in our view, any laxness on the part of the Department's employees could not give rise to implied consent under the facts of this case because Helen was given explicit notice to the contrary by the Department of Human Services. Helen was an employee of the Department of Human Services, Child Support/Paternity Division. A memorandum was sent around to all employees, including Helen, stating that employees of the Department of Human Services are not permitted to be the Personal Representative of Pay-Ease cardholders. Only Pay-Ease recipients and their Personal Representatives are permitted to use the recipient's card to access the Pay-Ease computer system. Pay-Ease recipients are told that they are not to give their card or PIN number to anyone other than their authorized Representative. To be assigned a Representative, the recipient must fill out a form with the Pay-Ease office.
Although Helen claims that she did not read the memorandum because she was in the hospital at the time it was distributed, employees are charged with keeping current with office memoranda and following the policies set forth in them. According to Steven Rice, the Director of the County Human Services Department, "all employees are informed it's their obligation to come back from any leave, any absences, to constantly review these letters that are issued." To ensure employee compliance, extra copies of memoranda are kept in a binder for all the employees to access. In fact, Rice stated that because compliance with the Department's memoranda is so important, an employee's "supervisor has an official file of them also." Rice also testified that the memorandum was not a new policy, but that the Department periodically reminds its employees of the policy because several employees have been caught stealing benefits. Based upon the foregoing, we find that this assignment of error is without merit.
 III.
In her second assignment of error, Helen argues that:
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING MRS. WASHINGTON'S MOTION FOR DIRECTED VERDICT AT THE END OF THE MRS. WASHINGTON'S CASE IN CHIEF.
Helen's second assignment of error is based upon her renewed motion for acquittal at the close of he case in chief. Helen argued that she was entitled to an acquittal because she believed that she had conclusively demonstrated the existence of an affirmative defense. Paragraph (C) of the offense of unauthorized use of property provides that the affirmative defenses available to unauthorized use of a vehicle under R.C. 2913.03 also apply to the offense of unauthorized use of property. Those affirmative defenses are:
 (1) At the time of the alleged offense, the actor, though mistaken, reasonably believed that he was authorized to use or operate the property.
 (2) At the time of the alleged offense, the actor reasonably believed that the owner or person empowered to give consent would authorize the actor to use or operate the property.
R.C. 2913.03(C)(1), (2).
Helen argues that she proved the first of those affirmative defenses, that is, that she reasonably, but mistakenly, believed that she was authorized to access the Pay-Ease computer system. Helen supports her argument by first asserting that all of the cardholders authorized her to access the Pay-Ease computer system in order to activate their cards. She argues that this authorization came in the form of the voluntary surrender of their Pay-Ease cards and their personal pin numbers to her husband.
We find that this argument also lacks merit. As we stated in our discussion of her first assignment of error, Helen was given notice that she was not permitted to access the Pay-Ease computer system by the Department through a memorandum stating that employees are not permitted to act as the Personal Representative of cardholders. Only cardholders and their personal representatives are permitted to access the Pay-Ease computer system. As we stated above, although Helen claims that she did not see the memorandum because she was in the hospital at the time that it was distributed, all employees are informed that it is their obligation to obtain any memoranda distributed during an absence when they return to work. Finally, the memorandum in question was not a new policy, it was merely a reminder of an existing policy.
Next, Helen argues that she reasonably, but mistakenly, believed that she was authorized to access the Pay-Ease computer system because, in her view, the Department of Human Services impliedly consented to her use of the computer system. In particular, she argues that the Department impliedly consented to her use because two of its employees, Reggie Orr and Janice Muncie, knew for some time that she was accessing the system and did not prevent her from using it or immediately report her. Helen claims that those employees' inaction made it reasonable for her to believe that she was authorized to access the computer system.
This essentially is the same argument that Helen made in her second argument under her first assignment of error. For the reasons set forth under her first assignment of error, we also find that the employees' inaction did not give rise to a reasonable, but mistaken belief that she was permitted to access the Pay-Ease computer system. Based upon the foregoing reasons, we find that this argument lacks merit and we overrule this assignment of error.
 IV.
Helen argues in her third assignment of error that:
 THE TRIAL COURT ERRED AS A MATTER OF LAW AND FACT BY FAILING TO GRANT MRS. WASHINGTON'S MOTION FOR ACQUITTAL OR NEW TRIAL BASED ON A LEGALLY IMPOSSIBLE VERDICT.
Helen was charged with a total of nine counts. The first six counts were for unauthorized use of property, the seventh count was for theft in office, and the last two counts were for attempted unauthorized use of property. Helen argues that the offense of theft in office is necessarily predicated upon being convicted of a theft offense. Furthermore, she argues that because she was found not guilty of any of the counts of unauthorized use of property or attempted unauthorized use of property, the underlying theft offenses with which she was charged, but was convicted of theft in office, the verdicts are inconsistent. On that basis, she argues that her conviction for theft in office cannot stand.
The offense of theft in office is set forth in R.C. 2921.41, which provides in relevant part that "No public official * * * shall commit any theft offense * * * when * * * the property * * * involved is owned by this state, any state, the United States, a county * * *." The committee comment to this section provides that in essence
 this section defines a species of aggravated theft, by adding two elements to any given theft offense. * * * If the offender is a public official [and] * * * if the property involved is public property * * * then the public servant involved * * * is guilty of an offense under this section.
R.C. 2921.41 Committee Comment. Although the offense of theft in office is charged as a separate count, it is clear from the statute and the committee comment that the offense of theft in office is predicated upon the commission of a theft offense. Thus, the verdicts of not guilty on the theft and attempted theft offenses appear to be inconsistent with the verdict of guilty on the theft in office offense.
Although the verdicts appear to be inconsistent, the Supreme Court has held that an inconsistency in a verdict cannot arise out of inconsistent responses to different counts. State v. Brown
(1984), 12 Ohio St.3d 147, syllabus; Griffin v. State (1868),18 Ohio St. 438, 444-45. The Court has held that an inconsistency can only arise when the jury gives inconsistent responses to the same count. Brown, 12 Ohio St.3d at syllabus; accord State v.Gleason (1996), 110 Ohio App.3d 240, 245. The Court explained that each count in an indictment charges a distinct offense and is independent of all other counts. Following that reasoning, the Court found that a jury's decision as to one count is independent of and unaffected by the jury's finding on another count.
Furthermore, the United States Supreme Court addressed the precise issue of a defendant being acquitted on a predicate offense while being convicted of a compound offense in UnitedStates v. Powell (1984), 469 U.S. 57, 105 S.Ct. 471. The Court rejected the contention that such a verdict necessitates the defendant's acquittal on the compound offense or that the defendant should be granted a new trial. The Court explained that inconsistencies between verdicts on separate counts do not necessarily mean that the jury made a mistake. In fact, the court found such inconsistencies could just as reasonably be the product of jury lenity. The Court further elucidated that any finding that the inconsistency was the result of some error that worked against the defendant "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." Id. at 67, 477.
Although the Court determined that a defendant may not attack his or her conviction on the basis of an inconsistency between verdicts on separate counts, the Court was careful to explain that the defendant is not left without protection against jury errors or irrationality. The Court stated that the defendant is protected from jury errors and irrationality by the test for sufficiency of the evidence. The court determined that when such an inconsistency arises, the defendant may argue that there was insufficient evidence to convict the defendant of the compound offense.
But, the Court warned that an acquittal on a predicate offense and a conviction on a compound offense does not automatically mean that there is insufficient evidence to support the conviction on the compound offense. The Court stated that the review of the sufficiency of the evidence on the compound offense should be taken independently of the jury's acquittal of the defendant on the predicate offense. The court concluded by stating that no further safeguards against jury errors or irrationality are needed.
Applying the rules set forth in Powell, we find that Helen may not attack her conviction of theft in office on the basis that her conviction of that offense is inconsistent with her acquittal on the predicate theft offenses. Rather, Helen's protection against jury mistake or irrationality is through arguing that there was insufficient evidence to convict her on the compound offense of theft in office. Helen raised this argument in her first assignment of error, and, after carefully considering it, we found that there was no merit to her sufficiency of the evidence argument. The assignment of error is overruled.
 V.
In her fourth assignment of error, Helen asserts that:
 O.R.C. 2913.04(B) IS UNCONSTITUTIONALLY VAGUE AS APPLIED TO MRS. WASHINGTON.
Helen argues that R.C. 2913.04(B) is unconstitutionally vague because she contends that it fails to define the term "owner" with sufficient particularity. Helen further argues that because the statute does not sufficiently define the term "owner," the statute fails to give notice to citizens of what conduct the statute prohibits and fails to provide adequate standards to prevent the arbitrary or selective enforcement of the statute. Helen also maintains that the statute is unconstitutionally vague as applied to her case because it is unclear whether the Pay-Ease cardholder or the owners of the Pay-Ease computer system qualifies as the "owner" for purposes of the unauthorized use of property statute.
The State has drawn our attention to the fact that Helen's counsel never raised this argument in the trial court. As a general rule "`an appellate court will not consider any error which counsel for the party complaining of the trial court's judgment could have been called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" State v. Awan (1986),22 Ohio St.3d 120, quoting State v. Childs (1968), 14 Ohio St.2d 56, clarified in State v. 1981 Dodge Ram Van (1988), 36 Ohio St.3d 168. The Supreme Court applied this general rule to the question of the constitutionality of a criminal statute in Awan, supra. In fact, the Court found that the rule applied not only to a defendant's claim that a statute is unconstitutionally vague on its face but also to a defendant's claim that the trial court applied the statute in such a way as to render the statute unconstitutionally vague. Id. at 122-123. Following the Court's decision in Awan, we find that Helen has waived her argument that R.C. 2913.04 is unconstitutionally vague and, therefore, we decline to address it now for the first time on appeal.
Nonetheless, we do mention that we do not believe that the definition of an "owner" was unconstitutionally vague as applied to her case. Even if cardholders could qualify as "owners" of the Pay-Ease cards under the statute's definition of an "owner," it is clear that they could not qualify as owners of the Pay-Ease computer system. Instead, it was manifest under the statute's definition of an "owner" and the evidence presented at trial that the Pay-Ease computer system was owned by the Federal, State, and County governments as well as by National City Processing Company. Therefore, we are convinced that the application of the plain error rule is inappropriate in this case.
Although we do not find that the definition of an "owner" is constitutionally infirm as applied to Helen's case, we do recognize that the unauthorized use of property statute has the potential of being used in instances where individuals would arguably not have notice that their conduct is prohibited by the statute. Furthermore, we believe that the statute may lack sufficient standards to prevent arbitrary and selective enforcement of the statute. We find this to be true as a matter of judicial notice because the number and type of instances in which the statute could be applied is growing as more systems are being computerized and more individuals are provided with computers to perform their work.
Conceivably, an individual could be prosecuted for the offense of unauthorized use of property on the basis that the individual exceeded his or her employer's scope of consent by using his or her work computer to type a personal letter. Furthermore, if the individual was convicted of the offense, the individual would be guilty of a felony. Certainly such an offense is not as serious as to constitute a felony. The possibility of this problem arising was noted in State v. Johnson (Feb. 13, 1992), Cuyahoga App. No. 59190, unreported.
Judge Harper, in a dissenting opinion, condemned the majority's affirmance of the defendant's conviction of unauthorized use of property. The defendant was the maintenance manager at the Northeast Ohio Regional Sewer District. The defendant informed some of his co-workers that he was going to take his computer home for the weekend to work on it. It was disputed whether he took it home for personal use or to work on District business. It was the District's policy, however, that employees were not permitted to take home District property, but it was questionable whether that policy was clear.
The defendant returned the computer before the end of the weekend. When it was returned, the defendant had placed a password on a program. Furthermore, District's employees were unable to access one of the computer's programs. There was no evidence presented, however, that the inability to access the program was due to the defendant's use of the computer over the weekend. Additionally, there was testimony by an employee that the computer worked well on the day that it was returned.
Based upon these facts, the defendant was charged with unauthorized use of property. The prosecution was unable to charge the defendant with theft because he returned the computer and there was no evidence that he initially took the computer with the intention of not returning it. In fact, there was much evidence to the contrary.
The defendant argued on appeal of his conviction of unauthorized use of property that the words "gain access" in the statute are unconstitutionally vague. The defendant pointed out that the Criminal Justice Committee and the Computer Law Committee of the State Bar Association have concluded in a joint report that this "`is likely to be the type of statute that many people unknowingly violate * * *.'" Id. at 9. The majority court inJohnson disregarded that report because it found that most of the complaints in the report did not concern the defendant's arguments. Furthermore, the majority found the terms "gain access" sufficiently clear to give the defendant notice that his use of the computer was prohibited.
Judge Harper in her dissent, however, called the defendant's felony conviction a travesty and stated that:
 An interpretation of a statute must accomplish the purpose for which it was intended, otherwise, the statute loses its effectiveness and meaningful purpose. * * * If the policy on which our law is founded is to be too broadly applied, as in the within case, then the law is no longer intended to protect, but to oppress.
* * *
 removing a computer without authorization is not an issue addressed by R.C. 2913.04(B). The Ohio Penal Code is replete with provisions intended to punish such conduct, but R.C. 2913.04(B) is not one of those provisions. Assuming arguendo that appellant's removal of the computer was [criminally] punishable, the facts of this case still preclude conviction because the state has failed to show that appellant in any way intended to deprive the District of its use of its computer.
Id. at 18-19.
Although we agree with Judge Harper that the application of this statute has the potentiality of raising issues of lack of notice and arbitrary application, we cannot find that the definition of an "owner" is constitutionally vague as applied to Helen's case. Furthermore, Helen has not contested other portions of the statute on the grounds of vagueness. This assignment of error is overruled.
 VI.
In her final assignment of error, Helen argues that:
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN INSTRUCTING THE JURY WITH A SUPPLEMENTAL DYNAMITE CHARGE, WHICH IMPROPERLY BALANCED AND IMPERMISSIBLY SUGGESTED A UNANIMOUS VERDICT REQUIREMENT.
Helen raises two arguments in support of her fifth assignment of error. First, she claims that the trial court erred in reading paragraphs one and two of the Ohio Jury Instructions regarding instructions for a deadlocked jury, but not reading paragraph three of those instructions which is an instruction concerning when it is impossible for a jury to arrive at a verdict. Second, she argues that the judge improperly emphasized the State's investment in the trial in its instruction to the deadlocked jury by stating that "There's been a lot invested in this case in terms of everyone's time and attention. We're asking you, if you can conscientiously do it, to arrive at a verdict." Tr. at 727.
As to Helen's first argument, we find that it is without merit. This identical issue was considered in State v. Martens
(1993), 90 Ohio App.3d 338. In Martens, the jury, after deliberating six hours, sent a message to the court asking, "How long is a reasonable time before we are considered a hung jury? We are still divided in our opinions." After reviewing the jury's question, the court determined that an additional instruction based upon State v. Howard (1989), 42 Ohio St.3d 18, was necessary and appropriate.
The Court in Howard rejected the traditional charge to deadlocked juries as set forth in the very early case of State v.Allen (1896), 164 U.S. 492, which instructed that if the larger number of jurors were
 for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.
Id. at 501. The Howard Court found that the Allen charge was unduly coercive to members of the jury in the minority because it orders them to reevaluate their position but does not require that members of the majority do the same. The Howard Court then went on to replace the Allen charge with the following instruction:
 The principle mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large portion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe that the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should reexamine their positions given that a unanimous decision has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the desire to arrive at truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of the judgment not concurred in by all other jurors.
Id. at 25-6. Rather than instructing the minority jurors to reconsider their position, the Howard charge asks all jurors to review their positions.
The defendant in Martens, supra, claimed, like Helen argues in the present case, that the court's Howard, supra, instruction was coercive because it required the jury to keep deliberating without instructing the jury that it was possible to not agree upon a verdict. As in the present case, the defendant in Martens
asserted that the court should have included the following instruction from the Ohio Jury Instructions:
 VERDICT IMPOSSIBLE. It is conceivable that after a reasonable amount of time honest differences of opinion on the evidence may prevent an agreement upon a verdict. When that condition exists you may consider whether further deliberations will serve a useful purpose. If you decide that you cannot agree and that further deliberations will not serve a useful purpose you may ask to be returned to the courtroom and report that fact to the court. If there is a possibility of reaching a verdict you should continue your deliberations.
4 O.J.I. § 415.50.
The Martens court disagreed with the defendant's contention, finding that the verdict impossible instruction is only appropriately given when the trial court determines that the jury, after deliberating for a reasonable amount of time, is unable to reach a verdict. The court based this decision upon its recognition that the verdict impossible instruction changes the focus of deliberations by asking the jury to decide whether a verdict can be reached through further deliberations. With this change of focus in mind, the court ascertained that if the verdict impossible instruction is given prematurely, the instruction may be inapposite to the goal of the Howard charge of encouraging a verdict where one can be conscientiously reached.
The court further stated that the determination as to whether the verdict impossible charge is necessary rests within the sound discretion of the trial court. Thus, the court found that the trial court's decision could not be disturbed unless it found that the trial court abused its discretion. Although the Martens court acknowledged that there was no indication in the record that the trial court considered whether the jury was irreconcilably deadlocked, the court determined that the record did not evidence that the court abused its discretion by giving the Howard charge without the verdict impossible charge.
The court also refuted the defendant's assertion that the verdict impossible charge was required to be given because it is contained in the Ohio Jury Instructions. The court explained that those instructions are not mandatory, but only recommended instructions. The court stated, "Requiring a trial court to rigidly follow these instructions would remove judicial discretion and control from trial proceedings and not allow the flexibility necessary to manage the various situations that arise during a jury trial." Id. at 343.
Turning to the present case, Helen's counsel did not object to the court's failure to include the verdict impossible charge. "`The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.'"State v. O'Dell (1989), 45 Ohio St.3d 140, 144 quoting State v.Underwood(1983), 3 Ohio St.3d 12, syllabus; Crim.R. 30 (A). Thus, for this court to find an error in the present case, we would have to find that the outcome of Helen's trial would clearly have been otherwise. We are unable to make such a finding.
At the time the jury informed the judge that they could not reach a decision, they had been deliberating for only four hours, which is not significant given this was a complicated case with over a week of testimony. In view of the short length of time that the jury had been deliberating, the trial court noted that it believed at that point in the case the verdict impossible charge was not appropriate yet. The court indicated, however, that if after giving the jury the Howard charge, the jury returned unable to reach a verdict, the court would instruct the jury as to the verdict impossible charge. Furthermore, the court stated that if, after giving the jury the verdict impossible charge, the jury informed the court that further deliberations would serve no useful purpose, the court would discharge the jury.
Under the facts of this case, we find that the trial court's instruction to the jury was entirely appropriate. If the court had given the verdict impossible charge to the jury at that time it would have been premature. In fact, the verdict impossible instruction if given at that time may have counteracted the goal of the Howard charge, which is to encourage a verdict where one can be conscientiously reached. Accordingly, we find no error in the trial court's instruction to the jury, let alone plain error. Therefore, we conclude that this argument lacks merit.
As to her second argument, Helen objects to the trial court's statement in its Howard charge that "There's been a lot invested in the case in terms of everyone's time and attention. We're asking you, if you can conscientiously do it, to arrive at a verdict." Tr. at 727. Helen argues that this statement improperly emphasized the State's investment in the trial and is "a tacit request from the presiding judge for jurors in the minority to surrender their personal belief in the Defendant's guilt or innocence, in deference to the State's investment in the trial in terms of time and money." Appellant's Brief at 36. Helen argues that this statement by the court violates the proscriptions in Howard, supra, against coercing the minority to surrender their positions.
As with Helen's previous argument, Helen's counsel failed to object to this portion of the trial court's instruction. The failure to object to an error causes a waiver of that error, unless the defendant can demonstrate that, but for the error, the outcome of the trial would have been different. O'Dell, supra, at 144. Therefore, for this court to find an error in the present case, we would have to find that, in the absence of this error, the outcome of Helen's trial would clearly have been otherwise.
We do not find that this statement by the trial court inappropriately emphasized the State's investment in the trial. Rather, we find that the trial court was clearly emphasizing everyone's time and expense in the trial, not the State's investment. The court emphasized everyone's time and expense in the trial in order to further the purpose of the Howard charge which is to encourage the jurors to reach a decision if they can conscientiously do so, not to coerce the minority to surrender their position.
Furthermore, we cannot find that the court's charge had the effect of coercing the jurors in the minority. When one reviews the court's charge in its entirety, the court made it manifest that "all jurors should reexamine their positions * * *," and stated that jurors for acquittal as well as jurors for conviction should reexamine their positions. Based upon the foregoing, we find that this assignment of error is without merit.
The decision of the trial court will be AFFIRMED.
WOLFF, J. and GRADY, J., concur.
Copies mailed to:
Cheryl A. Ross
Ronald E. Reichard
Hon. David A. Gowdown